**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 21-cv-2819**

ESTATE OF ZACHARY GIFFORD;

      Plaintiff,

v.

TRACY WEISENHORN, individually;
QUINTEN STUMP, individually;
CASEY SHERIDAN, individually;
SHERIFF FORREST FRAZEE, in his official capacity;
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF KIOWA, a/k/a KIOWA
COUNTY, COLORADO;

      Defendants.

---

### CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY

---

Plaintiff, by and through its attorneys, HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC, complains against Defendants and requests trial by jury as follows:

## I.     INTRODUCTION

1.     Law enforcement may not stop unarmed, non-dangerous suspects who are trying to flee by shooting them dead.

2.     On April 9, 2020, after a traffic stop for an alleged failure to signal, Undersheriff Tracy Weisenhorn and Deputy Sheriff Quinten Stump shot Mr. Gifford in the back three times as he ran away from them, killing him.

3.     Zachary Gifford was known to be unarmed, not displaying any weapons, not threatening these officers or anyone else, and obviously running away from them in an empty

field located in Brandon, Colorado. Brandon, Colorado has a population of around 20 or less and is often referred to as a "ghost town."

4.      As Zachary Gifford ran away from these officers, they shot him in the back multiple times. Undersheriff Weisenhorn shot first and Deputy Stump shot shortly thereafter. Mr. Gifford continued running away while these officers kept shooting him in the back for no reason. By the fourth shot Zachary Gifford had run approaching 100 yards away from where the shooting started.

5.      The fourth shot was fired by Deputy Stump from 24 yards away, 18 seconds after the third shot. During those 18 seconds, Undersheriff Weisenhorn was close by watching, doing nothing to stop Deputy Stump as he took aim and finished what she had started.

6.      This final shot caused Zachary Gifford to drop on the spot. Here is a picture of Mr. Gifford's covered body where he fell, bled out and died:



7.      This is a panoramic of the empty field where Mr. Gifford was killed:



8.      The killing of Zachary Gifford flouted all applicable constitutional principles governing the use of deadly force by law enforcement, which prohibit deadly force to seize fleeing suspects unless the suspect poses a significant threat of death or serious physical injury to the officers or others.

9.       Zach Gifford posed no danger at all. Instead, Mr. Gifford was a passenger in a truck pulled over for failing to signal when turning right off a rural state highway onto a dirt road, a pretextual stop intended to search for drugs.

10.      Neither Deputy Stump nor Undersheriff Weisenhorn were disciplined by Kiowa County Sheriff's Office for their killing of an unarmed fleeing man in an empty field. At least two other times in the six months prior to this shooting, Deputy Stump used deadly force to stop a suspect from fleeing without probable cause to believe that either suspect posed a significant threat of death or serious physical injury to the officers or others.

11.      Kiowa County Defendants took no action in response to the prior incidents or to the killing of Zachary Gifford, because it was actually the policy, custom and practice of this Sheriff's Office to use unconstitutional deadly force.

12.     In January of 2021, Deputy Stump was indicted by a grand jury and criminally charged for his role in the shooting of Zachary Gifford.

13.     Zach Gifford was a much-loved member of his community, described by a Magistrate Judge from Eads Colorado and former Deputy Sheriff, as a man "well-met and well-liked."

14.     Sheriff Sheridan resigned in reaction to the public outcry about this killing.

## II.     JURISDICTION, VENUE, AND NOTICE

15.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. §1983 and §1988. The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

16.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III.   PARTIES

17.     At all times relevant hereto, the decedent, Zachary Gifford was a resident of the State of Colorado and a citizen of the United States of America.

18.     Plaintiff Estate of Zachary Gifford is open in Kiowa County, Colorado, with his father, Larry Gifford, appointed as the Personal Representative. Mr. Gifford was a resident of the State of Colorado and a citizen of the United States of America.

19.     At all times relevant hereto, Defendant Undersheriff Tracy Weisenhorn was a citizen of the United States and a resident of the State of Colorado and was acting under color of

state law as the Undersheriff of Kiowa County, employed by the Kiowa County Sheriff's Office. At all times relevant hereto, this individually sued Defendant was acting within the scope of her employment.

20.     At all times relevant hereto, Defendant Deputy Sheriff Quinten Stump was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a law enforcement officer employed by the Kiowa County Sheriff's Office. At all times relevant hereto, this individually sued Defendant was acting within the scope of his employment.

21.     At all times relevant hereto, Defendant former Sheriff Casey Sheridan was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law as the Sheriff of Kiowa County, employed by the Kiowa County Sheriff's Office. Defendant Sheridan is sued individually for his own deliberately indifferent actions while he was the Sheriff of Kiowa County. At all times relevant hereto, this individually sued Defendant was acting within the scope of his employment.

22.     Defendant Forrest Frazee, Sheriff of Kiowa County Colorado, in his official capacity, is the Kiowa County Sheriff and a final policy maker for Kiowa County with respect to all matters concerning the Sheriff's Office, (hereinafter, "Sheriff Frazee").   Defendant Sheriff Frazee is sued for the entity level actions of the Kiowa County Sheriff's Office. This party is the proper Defendant for any declaratory or injunctive relief granted, in addition to damages.

23.     Defendant Board of County Commissioners of Kiowa County Colorado, a.k.a. Kiowa County, Colorado (hereinafter "BOCC" or "Kiowa County") is the local governmental entity responsible for Kiowa County, including its final delegated policy maker, the Kiowa

County Sheriff's Office. The Defendant BOCC represents, oversees, funds and sets policy for Kiowa County Colorado and/or delegates responsibility for law enforcement, including conformity with constitutional law, to the Kiowa County Sheriff's Office and the elected sheriff.

24.     Defendant Sheriff Frazee and the BOCC are sued under 42 U.S.C. § 1983 for Kiowa County's unconstitutional policies, customs, training and supervision, which were moving forces in the complained of constitutional violations and resulting claimed injuries, damages and losses.

25.     The BOCC, Sheriff Frazee, and the Kiowa County Sheriff's Office are referred to variously throughout as "the County," "Kiowa County," or "KCSO."

## IV.  STATEMENT OF FACTS

26.     Plaintiff hereby incorporates all other preceding paragraphs, as if they were fully set forth herein.

27.     On April 9, 2020, Mr. Gifford was helping his friend, Bryan Morrell, unload a log splitter off a truck in Brandon, Colorado.

28.     Also on April 9, 2020, Undersheriff Weisenhorn was in Brandon, Colorado to watch a house in the area for drug activity. She had been watching the house for a few weeks before this date.

29.     Undersheriff Weisenhorn saw Mr. Morrell and Mr. Gifford outside of this house near the truck they were unloading.

30.     Undersheriff Weisenhorn knew Mr. Gifford and believed there were rumors that he engaged in drug use.

31.     Mr. Morrell and Mr. Gifford got into the truck and drove away from the house,

looking for place to offload a log splitter from the back of the truck. The log splitter was too heavy for the two of them to get off a truck without being able to back up into a ditch to get it to ground level.

32.      Undersheriff Weisenhorn began following the truck.

33.      While following the truck, Undersheriff Weisenhorn aired to dispatch to run the license plate. At that point, Undersheriff Weisenhorn had no reasonable suspicion of any illegal activity by either man.

34.      She learned through dispatch that the truck was registered to Joanna Beightel and Cade Gustason. She continued to follow the truck.

35.      Mr. Morrell made a right turn off State Highway 96 onto Main Street, a dirt road. This intersection is in a rural area with very few people around, and looks like this:





36.     Undersheriff Weisenhorn then initiated a traffic stop, pretextually for failing to use a turn signal before turning on to this little traveled dirt road.

37.     The real purpose of this "traffic stop," however, was to try to concoct a reason to search the occupants and/or the truck for drugs.

38.     It was an expectation and custom of Kiowa County Sheriff's Office for officers to use traffic stops to look for other offenses and search vehicles.

39.     Deputy Stump heard this dispatch traffic and recognized the name of Cade Gustason as a person he suspected of being a drug dealer.

40.     Although Deputy Stump was actually under suspension by the County at the time, and Undersheriff Weisenhorn had not even requested back up or indicated the need for another officer to assist in what was ostensibly a traffic stop, Deputy Stump responded to the scene.

41.     Undersheriff Weisenhorn asked Mr. Morrell for his license and registration. Mr. Morrell, who was only a block from home, didn't have his license on him and was driving his daughter's truck.

42.     Mr. Morrell provided Undersheriff Weisenhorn his information and indicated where he lived. He also gave Undersheriff Weisenhorn his daughter's name, Joanna Beightel, the person she had just confirmed through dispatch owned the vehicle.

43.     During this interaction, Mr. Gifford searched for the registration and provided the valid registration to Undersheriff Weisenhorn.

44.     Undersheriff Weisenhorn asked Mr. Gifford his name and date of birth, which he truthfully responded was July 15, 1980.

45.     Undersheriff Weisenhorn wrote Mr. Gifford's name and date of birth on her arm, along with Mr. Morrell's information, and then went back to her car to contact dispatch.

46.     During this interaction both men behaved appropriately and did not do anything suspicious. At no point did Undersheriff Weisenhorn see the occupants of the truck doing anything suspicious.

47.     Undersheriff Weisenhorn turned off her body cam while she contacted dispatch and/or spoke with Deputy Stump.

48.     Through dispatch, Undersheriff Weisenhorn confirmed that Mr. Morrell did have a valid license and there were no outstanding warrants for his arrest.

49.     Undersheriff Weisenhorn gave dispatch the wrong birthday for Zach Gifford of June 15, 1980, rather than July 15, 1980, just as he told her minutes earlier. Dispatch thus couldn't find any one named Zach Gifford with the wrong birthday she provided but did find a Zach Gifford with the birthday of July 15, 1980.

50.     While Undersheriff Weisenhorn was in her car, Deputy Stump approached the vehicle and talked to Mr. Gifford and Mr. Morrell.

51.     Undersheriff Weisenhorn returned to the truck and ordered both men to step out.

52.     At that time, Undersheriff Weisenhorn had no lawful reason to instruct either of these men out of the truck – instead she manufactured reasons to get them out in service of her unconstitutional desire to search them for drugs.

53.     Undersheriff Weisenhorn told Mr. Gifford that dispatch reported his birthday as July 16, 1980, which intentionally misstated what she was told by dispatch. She accused Mr. Gifford of lying about his birthday, which was untrue and contradicted by the information she

just received.

54.     Undersheriff Weisenhorn used her own manufactured evidence about the birthday as a pretext to remove Mr. Gifford from the truck and institute an unlawful search.

55.     She decided to have both men patted down for weapons, even though they had not done anything suspicious.

56.     Neither officer had any reasonable or articulable suspicion that either man involved in this traffic stop was armed or dangerous.

57.     Further, both officers previously knew Mr. Gifford and had no reason to believe he was violent or dangerous based on any interactions or knowledge they had.

58.     Evidencing that she was not concerned for her own or anyone else's safety, Undersheriff Weisenhorn did not even have Mr. Morrell turn off the truck before he got out.

59.     Undersheriff Weisenhorn patted down Mr. Morrell, and Deputy Stump conducted a pat down of Mr. Gifford.

60.     These pat downs were unconstitutional searches in violation of the Fourth Amendment.

61.     Deputy Stump considered this to be a "Terry Frisk," which is a pat down for weapons. Deputy Stump conducted a thorough pat down of Mr. Gifford, following his routine pattern for such pat downs, and closely checked his waistband, his pockets and his body for weapons.

62.     Deputy Stump found Mr. Gifford to be in possession of a Leatherman, a box cutter, and a pliers combination tool.

63.     Deputy Stump's search was thorough enough to find every tool Mr. Gifford had

on him at the time.

64.    Revealing that Deputy Stump had no concern that Mr. Gifford was dangerous, let alone a reasonable or articulable suspicion of the same, Deputy Stump did not even confiscate these items. Deputy Stump did not take these from Mr. Gifford because, as he told investigating officers after the fact, he considered them just tools, not weapons.

65.    Deputy Stump admitted to subsequent CBI investigators that he found nothing on Zach Gifford's waistband or on his person during his search that would cause him any concern about weapons.  He said in response to this precise question: "Uh, I don't think so."

66.    Deputy Stump was not actually searching for weapons out of any concern that Mr. Gifford was armed in dangerous, and instead was clearly looking for drugs. After finishing this "pat down," Deputy Stump put his pinkie finger into the small coin pocket on the right side of Mr. Gifford's jeans to pull it open to see if anything was in that pocket.

67.    Deputy Stump had already determined that there was no weapon in that area and clearly knew that his pocket was too small to contain any weapon. At no point did Deputy Stump have any reason to believe anything in the coin pocket was a weapon.

68.    In Deputy Stump's unconstitutional search of the coin pocket during his unconstitutional pat-down, he saw a plastic bag he thought contained drugs and told Mr. Gifford not to move.

69.    Mr. Gifford immediately started to run away but was quickly tackled by Deputy Stump.

70.    Undersheriff Weisenhorn joined in and tased Mr. Gifford.

71.    Deputy Stump also tased Mr. Gifford and tried to choke him.

72.     Mr. Gifford was not violent or a threat toward the officers or anyone else, and instead was trying to flee.

73.     Neither officer perceived, nor could have reasonably perceived, Mr. Gifford to be a danger to them or anyone else, and instead both knew he was simply being disobedient by trying to run away.

74.     The scuffle and the tasings were directly caused by the unconstitutional search.

75.     After he was tased, Mr. Gifford continued to try to run away.

76.     Deputy Stump yelled 'let him go' but Undersheriff Weisenhorn instead threatened to 'fucking shoot' Mr. Gifford if he tried to run away.  She drew her gun and stuck it point blank on his back.

77.     While this was happening, Mr. Gifford was able to get out from under the officers and again started to run away.

78.     Undersheriff Weisenhorn, who was wearing a bullet proof vest, pointed her gun at him as he ran away in a deserted field parallel to a county road. She stood up, aimed her gun at his back, and shot him.

79.     When Undersheriff Weisenhorn shot, Zach Gifford was known to be unarmed. He was not suspected of any crime besides, perhaps, resisting arrest by trying to get away or at the most, drug possession. He was running away in a deserted field with no one nearby. He made no threatening gestures. Undersheriff Weisenhorn did not have probable cause to believe that he posed a significant threat of death or serious physical injury to herself or others. Mr. Gifford was a threat to no one, and no reasonable officer could reasonably perceive otherwise.

80.     This first shot hit him in the back and the officers heard him yelling out in pain.

81.     Though hit, Mr. Gifford continued to run in the empty field.

82.     A few seconds later, Deputy Stump also fired a shot at Mr. Gifford's back.

83.     At the moment of this second shot, Deputy Stump likewise knew Mr. Gifford to be unarmed. He was not suspected of any crime besides, perhaps, resisting arrest by trying to get away or at the most, having a plastic bag that might have drugs in it. Deputy Stump also knew that he had already been shot, was injured and was running away in a deserted field. He made no threatening gestures. Deputy Stump did not have probable cause to believe that he posed a significant threat of death or serious physical injury to himself or others. Mr. Gifford was a threat to no one, and no reasonable officer could reasonably perceive otherwise.

84.     Shortly thereafter, Undersheriff Weisenhorn fired another shot at the back at this still fleeing traffic stop passenger.

85.     At the time of this third shot, Mr. Gifford was far away from the officers, known to be unarmed, known to have been shot, and known to not pose a threat to anyone. He was still a threat to no one, and no reasonable officer could reasonably perceive otherwise. He still made no threatening gestures. Undersheriff Weisenhorn did not have probable cause to believe that he posed a significant threat of death or serious physical injury to herself or others.

86.     Out of these first three shots, Mr. Gifford was hit twice in the back.

87.     After this third shot, Undersheriff Weisenhorn and Deputy Stump both knew that he had been hit twice.

88.     While still able to keep trying to get away, he was obviously seriously injured, and these officers understood he would have to stop soon and be easily found. He was near no one, there was no one in the direction he was running, and he was known to be unarmed.

89.     It is obvious and well-known to any officer that you can't use deadly force to effectuate an arrest in these circumstances. Furthermore, to the extent that Undersheriff Weisenhorn and Deputy Stump wanted to arrest Mr. Gifford for misdemeanors including potentially having a baggie with drugs in his coin pocket while a passenger in a truck that failed to use a turn signal – or even for resisting by fleeing from an unlawful search – they knew it could easily be accomplished by catching up with him by car or waiting for him to collapse and taking him to the hospital.

90.     Instead, 18 seconds later, with Undersheriff Weisenhorn behind him watching, Deputy Stump took aim and fired again, hitting Mr. Gifford for the third time in the back and dropping him immediately to the ground.

91.     At the time of the fourth shot, Mr. Gifford was approximately *24 yards* from the closest officer. This final shot was depicted by CBI in the Arrest Affidavit for Defendant Stump as follows:



Location where Deputy Stump believed Zachary Gifford fell after being shot:

*Appx. 230' east of the stop sign (Estimated 24 yards from the location of the final shot and the location of Zachary Gifford's body)*

The tree that KCSO Deputy Stump identified that he was standing near when he fired his last shot.

Location of Zachary Gifford's body

Above is a photograph[20] that depicts the location where KCSO Deputy Stump fired his last shot at Zachary Gifford.

92.     Both Undersheriff Weisenhorn and Deputy Stump used objectively unreasonable and grossly excessive force, and each were also part of a collective use of force.

93.     Undersheriff Weisenhorn as a collective part of that use of force is thus also liable for the final shot and all those that preceded it. She completely failed to intervene to stop the final shot, despite ample opportunity to do so. Instead, she watched as her subordinate took aim at a man already shot twice, threatening no one and running away.

94.     Mr. Gifford had three gunshot wounds, and each officer shot two bullets.

95.     This following picture was taken by investigators after the shooting. The orange cone at the bottom of the picture represents where Mr. Gifford fell, and the orange cone by the tree represents where Deputy Stump was located, with the cones being about 24 yards apart:



96.     This picture shows the location from an aerial view. The red circle on the photo

shows the field Mr. Gifford was running into, with the tree at the top of the circle being the same

tree Deputy Stump was standing next to when he fired the final shot. Mr. Gifford was running to

the right in the picture, *i.e.*, away from the few abandoned buildings in that area:



97.     As Zach Gifford lay in a field dying from these multiple gunshot wounds, he used

his last breaths to ask officers to tell his parents that he loved them. Even while he was bleeding

out, curled up in a fetal position, and taking his final breaths, Undersheriff Weisenhorn actually

used her pink personalized handcuffs to handcuff this dying unarmed man.

98.     The Coroner depicted the three shots that hit Mr. Gifford's back as follows:



99.     The coroner determined that the manner of Mr. Gifford's death was a homicide, and that he died from the combination of multiple gunshot wounds, finding:

> OPINION: It is my opinion that Zachary Gifford, a 39 year old male, died as a result of multiple gunshot wounds. The bullets collectively perforated the right lung, mesentery and stomach, resulting in massive blood loss and his subsequent death. Investigation and autopsy findings are consistent with these wounds being the result of the actions of another person or persons.

100.    In their interviews with CBI, Deputy Stump and Undersheriff Weisenhorn lied about key facts pertaining to Mr. Gifford's pre-shooting conduct and the incident.

101.    At the time of the incident, it was clearly established that officers could not stop a fleeing unarmed, non-dangerous suspect who was not a significant threat of death or serious physical injury to them or to others by shooting him dead.

**Allegations Related to
Kiowa County's *Monell* Liability and
Sheriff Sheridan's Individual Supervisory Liability**

102.    At all times relevant hereto, Kiowa County Sheriff's Office had a custom and pattern of using deadly force to seize fleeing suspects, regardless of whether the officer has probable cause to believe that the suspect is an imminent threat of death or serious physical injury to officers or others.

103.    In the shooting of Zach Gifford, this *de facto* policy is why the County Undersheriff used such patently unconstitutional deadly force, and also why she did not stop her subordinate from doing the same.

104.    Undersheriff Weisenhorn is both a delegated final decision maker on the scene, and an enforcer of the actual unconstitutional deadly force policy, custom and habit for the department.

105.    That Undersheriff Weisenhorn started and continued shooting someone in his back, someone who was unarmed and undeniably only trying to run away from a traffic stop with potentially a small bag of drugs, evidences her understanding that this was Kiowa County's *de facto* unconstitutional policy regarding the use of deadly force.

106.    That Undersheriff Weisenhorn did not even try to stop her subordinate Deputy Stump from using deadly force to seize an already shot and injured man from fleeing without probable cause to believe that he posed a significant threat of death or serious physical injury to her or others, also evidences her understanding that this was Kiowa County's *de facto* unconstitutional policy.

107.    This deadly *de facto* policy can also readily be seen by the Department's response to this obvious unconstitutional killing.

108.    After killing Mr. Gifford, Tracy Weisenhorn was briefly suspended with pay, remaining the Undersheriff until almost a year later. During her eleven months of continued employment, Undersheriff Weisenhorn received no retraining, was not disciplined, or even reprimanded for her part in shooting and killing Zach Gifford in an empty field. Indeed, she remained on payroll and went on vacation with former Sheriff Sheridan to the 2020 Sturgis Motorcycle Rally. Even after criminal charges were filed against her subordinate co-shooter, no discipline was issued.

109.    Undersheriff Weisenhorn was terminated on March 8, 2021, eleven months after shooting Mr. Gifford. Her termination did not even mention her shooting a fleeing unarmed man who did not pose a threat of death or serious physical injury to the officers or others.

110.    Likewise, Deputy Stump was also not retrained, disciplined, or reprimanded for shooting and killing an unarmed man in an empty field. He remained a Deputy Sheriff with Kiowa County until he was finally terminated in September of 2020 for an *unrelated* incident in which he drunkenly shot his service weapon at stop signs while off duty. Deputy Stump's role in Mr. Gifford's killing was also not even mentioned in his termination.

111.    Kiowa County Defendants, through former Sheriff Sheridan, ratified this use of force in that they, knowing the basis for the conduct, authorized and approved of the killing of Zach Gifford.

112.    More specifically, after the killing of Zach Gifford, there were also no trainings, discipline, or policy changes with any of the Sheriff's Office personnel about the constitutional bounds of when deadly force is permitted. Thus, in response to a CORA request for all documents relating to any discipline or training responsive to the shooting of Zach Gifford and when deadly force may be used, former Sheriff Sheridan responded with a signed letter, admitting that "no records exist."

113.    Even after Deputy Stump was charged with a crime and the community was in an uproar about this unjustifiable killing, County Defendants took no actions against former Sheriff Sheridan, who ultimately resigned on his own because of the community response.

114.    Both Deputy Stump and Undersheriff Weisenhorn reportedly left their previous employments under questionable circumstances. For example, on information and belief, Deputy Stump was terminated from his two previous places of employment as a law enforcement officer. About his leaving Norwood, Colorado, the Town Administrator publicly stated "[l]et's just say he had made some mistakes and it didn't seem to get any better. He wasn't a good fit. He didn't

take direction very well."

115.    Prior instances, available just pre-discovery, show that this unconstitutional *de facto* policy and custom of using deadly force against non-threatening fleeing suspects was well known, condoned, tolerated, ratified and expected.

116.    As shown below, at least twice in the six months prior to this shooting, Deputy Stump used deadly force to stop a suspect from fleeing without probable cause that the suspect posed a risk of death or serious physical injury to officers or the public. These events were known to and/or reviewed by the Sheriff and Undersheriff with no discipline or re-training imposed. This is because they actually met the above-described *de facto* policy, custom, habit and practice of the department.

117.    The Kiowa County Sheriff's Department is small, only four to six people including the Sheriff and Undersheriff. The following instances are not isolated ones in a huge police force of a major city. Rather, they show the custom and training of the entire department.

### *Luis Hernandez Ramming Incident*

118.    On December 6, 2019, four months before the Gifford shooting, Deputy Stump learned of a vehicle chase involving a felony suspect driving a Mercedes. The details of the suspect's alleged conduct were not then known to Deputy Stump.

119.    He joined the chase.

120.    Former Sheriff Sheridan was himself actively part of the dispatch that instructed Deputy Stump to pursue the vehicle and Deputy Stump was aware that the Sheriff was listening to him.

121.    Deputy Stump was pursuing the vehicle when the suspect did a U-turn and tried to

pass Deputy Stump.

122. Rather than let him get away, and, as he put it, to "end the pursuit," Deputy Stump waited for him to start to pass him and then used deadly force with his car, purposely turning left into the suspect's rear driver's side. This caused the suspect's car to spin out and crash, caused significant damage to both cars, and rendered Mr. Hernandez unconscious. At the time he rammed his vehicle into the fleeing vehicle, Deputy Stump was not in danger of being hit.

123. Deputy Stump's dangerous vehicle maneuver was not a recognized or accepted police practice of stopping a car and constituted unconstitutional deadly force.

124. This use of deadly force was intended only to stop the chase and was not based on any probable cause that the suspect then posed a significant threat of death or serious physical injury to officers or the public.

125. Prior to intentionally crashing his police car into the car of the fleeing suspect, Deputy Stump announced over dispatch to the Sheriff that he was going to "try to pin him."

126. Sheriff Sheridan thus knew that Deputy Stump intended to ram Mr. Hernandez with his car but chose not to intervene to stop this use of deadly force. He and Kiowa County did not investigate or discipline Deputy Stump because it was the custom, habit and practice and official policy expectation that KCSO officers were authorized to use deadly force to stop fleeing suspects without probable cause to believe the suspect posed any threat of death to the officers or others at that time.

127. To Sheriff Sheridan's awareness, Deputy Stump's use of deadly force led to the previously filed felony eluding charges against Luis Hernandez being voluntarily dismissed.

### *Christopher Corbett Shooting Incident*

128.    On Christmas Day, 2019, Deputy Stump pursued Christopher Corbett in a car chase.

129.    Mr. Corbett was suspected of driving a stolen truck and drove into an empty field with Deputy Stump pursuing him.

130.    Deputy Stump exited his vehicle and jumped a fence to get closer to Mr. Corbett's truck.

131.    Mr. Corbett was stuck in an arroyo and was rocking the truck back and forth to become unstuck. Mr. Corbett didn't look at Deputy Stump or try to hit him with his truck – he was just doing what Mr. Gifford and Mr. Hernandez were – trying to get away.

132.    While behind the truck, Deputy Stump opened fired on Mr. Corbett as he began to get unstuck and drive away.

133.    Deputy Stump admitted that at the time he fired his weapon, he was not afraid of being struck by Mr. Corbett's truck, nor did he believe that Mr. Corbett posed an immediate threat of death or serious physical injury to him, other officers, or the public.

134.    Nevertheless, Deputy Stump shot nine rounds into the back of the truck because again, he was "wanting to stop the pursuit."  The admitted and only purpose of firing his gun was to stop the chase.

135.    Seven of the bullets hit the truck, including one that lodged in the headrest on the driver's side, coming very close to hitting Mr. Corbett in the back of the head, as shown below:

 

136.    The suspect escaped on foot and was apprehended elsewhere.

137.    Using deadly force to stop an allegedly stolen truck from driving away in an empty field was unjustified and unconstitutional.

138.    Despite actually knowing Deputy Stump had used deadly force to stop a pursuit *twice in one month*, former Sheriff Sheridan did not remove Deputy Stump off of the case or initiate an internal investigation.

139.    Instead, Sheriff Sheridan allowed Deputy Stump to present the District Attorney with a search warrant to search Mr. Corbett's truck, even though he was involved in the use of deadly force against him. It violates all police practices to allow a deputy who has employed deadly force on a suspect to remain an investigating officer into that suspect's behavior.

140.    The District Attorney informed former Sheriff Sheridan that Kiowa County needed to have a policy to investigate officer involved shootings and explained that "[w]hen an officer fires a weapon at another person – whether there is injury or death or neither – the case must be investigated and reviewed by either your agency or another agency to determine whether the use of force was either unlawful or justified."

141.    The District Attorney also told the Sheriff to contact another independent Sheriff's office and ask them to investigate whether charges should be brought against Deputy

Stump, suggesting that he also conduct an internal investigation regarding whether any policies were violated.

142.    Former Sheriff Sheridan knew full well that such incidents needed to be investigated but had no intention of doing so or removing Deputy Stump from the Corbett case because, again, Deputy Stump did exactly what was expected of him under Kiowa County's unconstitutional deadly force practice – he used deadly force to try to seize a fleeing suspect.

143.    Only after the DA told former Sheriff Sheridan that he needed to remove Deputy Stump from the case, did anyone even interview Deputy Stump about this shooting incident. Unsurprisingly, that investigation was a sham investigation, designed to cover up and justify Deputy Stump's use of force. Still, it unequivocally revealed that he lied about the justification in his use of force report, and, in fact used deadly force without any perception that he or others were in immediate danger.

144.    In fact, in that investigation, contrary to his use of force report, Deputy Stump admitted that: "I thought there for a moment he was going to hit me, <u>then I noticed that he wasn't</u>.  I already had my weapon drawn, I was wanting to stop the pursuit, it had already started in Kansas and it had already went this far and I didn't know what else this guy was capable of doing even if he did get away." (Emphasis supplied).

145.    Sheriff Sheridan was reportedly told by Sheriff Zordel of Prowers County, after the Corbett investigation, that he should fire Defendant Stump.

146.    Despite Deputy Stump's admissions that he was not in fear for his own or others' safety when he opened fire on Mr. Corbett, Kiowa County Sheriff's Office issued no discipline,

found that no policies were violated, and did not conduct any re-training.  Instead, the matter was closed.

147.    Charges related to Mr. Corbett's driving and eluding were also dropped because of Deputy Stump's egregious use of deadly force.

148.    During the Corbett incident, Deputy Stump left his car at the scene, which was unlocked and contained weapons. It was later discovered by a state trooper, who locked the car and told Kiowa County that one of their vehicles containing guns had been left unsecured. No discipline or re-training was issued to Deputy Stump for leaving his unlocked patrol car that contained firearms in it on the side of the road.

149.    As with Mr. Gifford, this shooting of a fleeing suspect took place in an empty field, far away from anyone other than Mr. Corbett and Deputy Stump.

150.    Just like with Mr. Hernandez and Mr. Gifford, Deputy Stump used deadly force because he "was wanting to stop the pursuit" even though the suspect was not believed to pose an imminent threat to him or others at the time. In all three instances, Deputy Stump used force to stop the suspect from fleeing, without regard for any justification for the use of deadly force.

151.    At the time of Gifford, Hernandez and Corbett incidents, the entire Kiowa County Sheriff's department consisted of between four and six people including the Sheriff and Undersheriff, meaning more than half of the department engaged in, approved, condoned and tolerated using deadly force against fleeing suspects who posed no immediate risk of harm to officers or the public.

152.    In all three instances, no training or reprimand was issued because use of such force to seize fleeing suspects, rather than to neutralize threats, was indeed the actual unconstitutional policy, practice, and custom of the Kiowa County Sheriff's Office.

### Deputy Stump's Dangerous Behavior in Other Fleeing Suspect Cases

153.    Other instances of dangerous behavior by law enforcement in suspect chases further illustrates the Sheriff's Office expectation that its' deputies effectuate an arrest no matter the danger to the suspect or public.

154.    On October 31, 2019, Deputy Stump witnessed a car driving at unsafe speeds and initiated a high-speed chase. He pursued a car from less populated areas at extremely high speeds, well over 100 miles per hour, into a populated area, until the car finally hit a restaurant and then crashed into a light pole in the restaurant parking lot. No discipline or retraining was issued or conducted after this obviously life-threatening dangerous behavior.

155.    In January 2020, Deputy Stump chased yet another fleeing suspect in a populated area at such a reckless rate of speed that he lost control of his car, driving through a fence and into a ditch, causing significant damage to the patrol car. Sheriff Sheridan found that Deputy Stump had "failed to provide due regard for the safety of the public." Deputy Stump was trivially "disciplined" for this January 2020 chase – but the discipline imposed was so minor as to amount to no discipline at all. He was given one day off with pay. No training or re-training was provided.

156.    On April 8, 2020, the day before Mr. Gifford was shot, Undersheriff Weisenhorn disciplined Deputy Stump for "insubordination". Specifically, she gave him a warning for being insubordinate to supervisors, using vulgar and insulting name calling, refusing to accept help or

learn from other deputies, refusing to obey commands of supervisors, mocking and questioning his supervisor's decisions.

157.    Even in this "discipline," he was commended for "doing better with trying to find other violations on your stops … and trying to search vehicles."

158.    Undersheriff Weisenhorn's discipline consisted of a one-day suspension, set specifically to start the next day April 9, 2020 at 8:00 am, and to write apology letters to her and Corporal Swanson.

159.    Deputy Stump refused to sign the discipline and was clearly not stopped from working the next day despite his suspension, as he responded to the scene with Zach Gifford.

160.    Undersheriff Weisenhorn was attempting to impose discipline for Deputy Stump's refusing to listening to her, not following her commands, mocking and questioning her decisions and then did not even follow the discipline she imposed, without anything being done by her to keep this dangerous and insubordinate deputy from working as an armed officer during his suspension.

161.    On information and belief, former Sheriff Sheridan intervened in this discipline and allowed Deputy Stump to work on the day he and Undersheriff Weisenhorn killed Zach Gifford.

162.    One of the reasons Deputy Stump's superiors allowed his behavior to continue unchecked was because he was well known to be the top earner for the Sheriff's Office through fines generated from his extensive issuance of traffic tickets, which also provided substantial revenue that the Board of County Commissioners relied on for County expenses. Deputy Stump was frequently praised for going "above and beyond" in his "dedication to traffic stops."

163.    When Deputy Stump was supposed to be off under suspension for insubordination, he and Undersheriff Weisenhorn collectively shot Mr. Gifford.

**Facts Relating to Damages**

164.    The Estate of Zachary Gifford has suffered significant damages, entitling it to recover its compensatory and special damages, including for death, loss of enjoyment of life, loss of relationships, pain and suffering before death, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, and other damages, all in amounts to be proven at trial.

165.    The Estate is also entitled to recover for the value of the Zachary Gifford's lost life and lost pleasure of living, including the economic, moral, and philosophical value society places on that life, including his enjoyment of the activities of life and his expectations of life's future prospects.

166.    The Estate of Zachary Gifford is entitled to compensation for all his pre-mortem suffering. The final minutes of Zach Gifford's life were intensely dominated with pain and suffering including his consciousness of impending death.

167.    Each shot is to be valued and compensated. One bullet went through his right thoracic back, perforating the skin, subcutaneous tissues, musculature, posterolateral right rib, right lung, and the anterior right third intercostal musculature before exiting. Another bullet perforated the skin, subcutaneous tissues, and embedded in the muscle of his right lower back. Another bullet entered his left lower back and perforated the skin, subcutaneous tissues, left psoas muscle, mesentery, and the stomach before exiting. The shot that missed him undoubtedly caused additional trauma.

168.    These bullets ripped through his muscles, organs, and bones, causing extraordinary pain and existential fear. The bullet that went through his lung caused horrible suffering and difficulty breathing.

169.    Mr. Gifford had considerable blood loss as he lay in the field and undoubtedly suffered severe fear, dread, pain, and sadness, as he died asking the officers to tell his parents that he loved them.

170.    The Estate of Zachary Gifford is also entitled to compensation for his loss of his many loving relationships for the period of his expected normal mortality table life span.

171.    Zach Gifford was a man "well-met and well-liked." He was a much loved and valued member of his community. The outpouring of grief from his community evidences the deep relationships that he lost.

172.    More particularly, his estate's loss of consortium damages encompasses the loss of his relationships with his mother, his father, his siblings, Joshua Gifford and Noah Gifford, his niece and nephews, and with numerous persons in his community, including his girlfriend Sherri Linn Boulcher, as he had an intrinsically significant relational interest with each of them.

173.    Below are pictures of Mr. Gifford alone and with his family:

 

  

174.    Zach Gifford's mother has written about her son: "I love how much you grew to love serving others. You were such a people person, bringing joy and laughter wherever you went. In all your days you never changed." His closeness with his mother was known to everyone who knew them. He was so in tune with his mother that she could not stop stuttering for months after he was killed.

175.    Zach Gifford's father describes his son as "always smiling, inquisitive, industrious, always exploring and sometimes challenging Son." His closeness with his father was known to everyone that knew them.

176.    Zach Gifford also had very close relationships with numerous members of the community.

177.    The day after his death, the local movie theater placard read "Zach" in honor of his life and his work to help renovate the theater:



178.    The local community was outraged by this abuse of police power. There was an outpouring of love in support of Mr. Gifford and his family – underscoring the depth and veracity of the relationships he lost. Dozens of community members wrote descriptions of Mr. Gifford.

179.    Sherri Linn Boulcher has stated: "I could seriously go on forever about Zach and his loving gentle kind family that he adored. He had a fun and close relationship with his mother. . . His true idol was his father… I know he wished he was living closer to his brothers. . .but he was extremely proud of them and loved them so much! His niece and nephews though they truly held his heart."

180.    The current Mayor of Eads, Mayor Joseph Shields, described Mr. Gifford as follows: "[H]e was definitely a people person and was always jovial, his outlook was positive and he enjoyed life and the people around him.… He worked tirelessly and was constantly focused on doing the best job possible. If you needed anything and he possessed it, it was yours. He was always respectful to people and I believe that he bore no animosity to anyone. Zach enjoyed life and I can't remember seeing him when he was not smiling. To Zach, family was everything and the feeling was reciprocated. He not only had his family by birth but he had an

extended family of the Eads Community and all of the people he met and with whom he associated. . ."

181.    Eads Municipal Judge Campbell, also a former Deputy Sheriff of Hidalgo County, spoke for the community and for the Estate of Zachary Gifford when he said, "Zach Gifford's life mattered."

182.    Zachary Gifford was known for always helping others. He loved working as a handyman and living in a way he could support. He took great joy, pleasure and satisfaction from his work including his service of others and from doing the many things and activities he loved.

183.    As his Pastor Brett Ransom put it: "I don't remember a time seeing Zach without a smile on his face. He was truly a blessing to be around.  He had a servant's heart. . ."

184.    His friend Jamie Crockett said this:

You could write a book of essays totaling 100,000 words from people in the community that Zach would help. I literally think it was against his nature to not take advantage of every single opportunity he saw to help someone out. He was the type of guy that would run across the street just to hold the door open for a total stranger when he wasn't even going into the store that they were entering. He would mow lawns for elderly towns people just because. He would volunteer hours a day, for months to help build the stage that would be used for multiple events in the community. From graduations, to summer concerts and fair dances, Zach was always there to help set up and tear down the stage. To my knowledge he never was paid for the community work. He simply gave off his time, working as hard for nothing as he would for pay.

185.    His brother Joshua Gifford wrote: "He will not see the influence he had on his niece & nephews. He will not be there when I need his help again. He will not hear how proud of him I am. His opportunities for influence are gone, his craftsmanship resides in jobs done and jobs unfinished, his hope to transform aged wood into art sits in his shed, his quiet serving and giving to the community has been stolen, his wisdom and laughter have silenced, his future has

been shot in the back."

186.    Mr. Gifford's Estate has suffered damages for his loss of life, including his lost pleasure, enjoyment, and future prospects over a normal period of mortality.

187.    Zach Gifford liked climbing, hiking, fishing, golf, wrestling and pool among other sports and had many skills. He enjoyed music and art. He enjoyed creating and working with his hands.

188.    Here are examples of his art:

 

189.    In his world, he was a huge player, known, beloved, admired, friended and now greatly missed by all. While he struggled with addiction, this was only an aspect of this man, and did not alter his many enjoyments and pleasure with life.

190.    Mr. Gifford's Estate has suffered economic damages for his lost income and for the value of his lost economic benefits and services that he provided to his community in amounts still being ascertained.

191.    Zach Gifford was a very hard worker and while he did work for needier others for free, he also made money from his many handyman jobs. He was a general handyman, skilled at plumbing, tree trimming, home repairs, and construction. He was very skilled at gardening and

landscaping, working for years in the family business in Eads.  He was good with computers and technology.

192.    The Estate of Zachary Gifford is also entitled to punitive damages against individual Defendants, in that their actions were taken maliciously, willfully and with a reckless and wanton disregard of the constitutional rights of Plaintiff.

193.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Fourth Amendment Violation - Excessive Force Resulting in Death**
(Estate of Zachary Gifford Against Individual Defendants Weisenhorn, Stump and Sheridan)

194.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

195.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

196.    Zachary Gifford was a citizen of the United States and Defendants Undersheriff Weisenhorn and Deputy Stump are persons for purposes of 42 U.S.C. § 1983.

197.    Defendant Undersheriff Weisenhorn, at all times relevant hereto, was acting under the color of state law in her capacity as the Undersheriff for Kiowa County.

198.    Defendant Deputy Stump, at all times relevant hereto, was acting under the color of state law in his capacity as a Deputy Sheriff for Kiowa County.

199.    At the time of the complained of events, Zach Gifford had a clearly established constitutional right under the Fourth Amendment to be free from pretextual unjustified detentions and searches of his person.

200.    At the time of the complained of events, Zach Gifford had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure and death through excessive force.

201.    Specifically, it has been clearly established since at least 1985 that it violates the Fourth Amendment to use deadly force to stop a fleeing felon, let alone a mere misdemeanant suspect, when the officer does not have probable cause (a reasonable basis supported by the totality of the circumstances) to believe the suspect then posed a significant threat of death or serious physical harm to the officer(s) or any other person. As the Supreme Court explained in *Tennessee v. Garner*, it is not better that all fleeing suspects die than that they escape.

202.    Any reasonable law enforcement officer knew or should have known of these clearly established rights at the time of Mr. Gifford's death.

203.    Prior to the use of force, Mr. Gifford's right to be free from unconstitutional searches was violated when he was ordered out of the truck without a reasonable suspicion that he was engaged in criminal activity, when the officers conducted a pat down without harboring an articulable and reasonable suspicion that he was armed and dangerous, and when Deputy Stump searched parts of Mr. Gifford's pants that he knew could not contain a weapon and with the sole purpose of looking for drugs.

204.    Defendants Weisenhorn and Stump then seized Mr. Gifford by means of objectively unreasonable and excessive, deadly force when they shot him to death without

having probable cause to believe Mr. Gifford posed an immediate significant threat of harm to either of them or the public. Defendants Weisenhorn and Stump did not have a legally valid basis to seize Mr. Gifford in the manner and with the level of force used under the circumstances present. The decision to employ deadly force by shooting Mr. Gifford in the back multiple times and killing him as a proximate cause and result was excessive force under the circumstances.

205.    Any reasonable officer in their position would have known that it was unreasonable to use deadly force under the totality of the circumstances and that to do so would violate Mr. Gifford's clearly established constitutional rights.

206.    These Defendants were engaged in a collective use of deadly force and are jointly liable for all damages resulting from that force.

207.    These Defendants also failed to intervene in each other's use of deadly force, despite opportunity to do so.

208.    Defendants Weisenhorn's and Stump's actions were motivated by malice and/or involved reckless or callous indifference to Mr. Gifford's federally protected rights, and these Defendants engaged in these actions and omissions intentionally, willfully, and/or wantonly, and a reckless disregard for Mr. Gifford's constitutionally protected rights.

### *Individual Supervisory Liability*

209.    Defendant Sheridan is a person for purposes of 42 U.S.C. § 1983.

210.    Defendant former Sheriff Sheridan, at all times relevant hereto, was acting under the color of state law in his capacity as the Sheriff of Kiowa County.

211.    Former Sheriff Sheridan was personally involved in the described retention, training, policy setting, disciplinary decisions and hiring related to Deputy Stump and others in the KCSO.

212.    Defendant Sheridan was deliberately indifferent in setting and implementing an unconstitutional *de facto* policy for Kiowa County Sheriff's Office in the form of a tolerated, condoned, and wide-spread custom, habit and practice of using deadly force to seize fleeing suspects, even where the officer did not have probable cause to believe that the suspect was an immediate threat of danger to the officers or the public.

213.    Defendant Sheridan was repeatedly deliberately indifferent in training and re-training Sheriff's Office employees, including Deputy Stump, on the appropriate use of deadly force.

214.    Defendant Sheridan was deliberately indifferent in disciplining and failing to discipline or terminate Deputy Stump for his reckless and unconstitutional police practices.

215.    Defendant Sheridan knew that his acts or omissions were substantially certain to cause KCSO patrol officers, including Defendant Weisenhorn and Defendant Stump, to violate individual's constitutional rights to be free from excessive deadly force, and yet he consciously and/or deliberately chose to disregard this risk of harm in adhering to this policy, custom or practice of failing to require, train, or supervise officers in the office to use deadly force against fleeing suspects within constitutional limits, and/or deliberately chose not to provide adequate training to KCSO officers in this area.

216.    The deliberate indifference of former Sheriff Sheridan is affirmatively linked to the constitutional violation at issue.

217. Defendant Sheridan set in motion a series of events that he knew would cause an individual in a similar situation as Mr. Gifford to be deprived of the constitutional right to be free from excessive force at the hands of law enforcement. But for the above acts or omissions of Defendant Sheridan, Mr. Gifford would not have been subject to a violation of his Fourth Amendment rights, and such deprivation was a proximate cause and a natural and foreseeable consequence of these acts and omissions.

218. As a result of the acts and omissions of Defendants Weisenhorn, Stump, and Sheridan, Plaintiff Estate has suffered the above alleged injuries, damages and losses, including the death of Zachary Gifford, entitling it to recover his compensatory and special damages, also including the value of loss of his constitutional rights, loss of life and pleasure of living, pain and suffering before death, lost economic benefits and services that he provided to his community, lost earnings and earnings capacity for the expected productive working lifetime of Zachary Gifford under the mortality tables, loss of consortium, and other damages recoverable under 42 U.S.C. § 1983, all in amounts to be proven at trial.

219. Plaintiff Estate has also incurred special damages in the form of funeral expenses.

220. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

221. In addition to compensatory, economic, consequential, and special damages, Plaintiff is entitled to punitive damages against Defendants Weisenhorn, Stump, and Sheridan in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – *Monell* Liability**
**4ᵗʰ Amendment**
(Plaintiff Against Defendants BOCC and Sheriff Frazee)

222.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

223.    The above listed instances and conduct reveal that, at the time of the incident, Defendants had a policy, practice, habit and custom of authorizing, condoning and tolerating officers to use deadly force against fleeing suspects to stop them from fleeing, regardless of the crime they were wanted for and without regard to having probable cause to reasonably believe the suspect posed a significant threat of death or serious physical injury to the officers or others at the times deadly force was deployed.

224.    Kiowa County Defendants were also on express notice that using excessive force to stop fleeing suspects was a widespread problem in the department involving at least half of its force. This practice, habit and custom was widespread and constituted the *de facto* policy of the County Defendants.

225.    Kiowa County Defendants were deliberately indifferent in failing to properly train, supervise, and discipline its employees, including Undersheriff Weisenhorn, and Deputy Stump with respect to the Constitutional limitations on the use of deadly force.

226.    Kiowa County Defendants also knew "to a moral certainty that their police officers will be required to arrest fleeing felons" and other suspects in the execution of their official law enforcement duties. *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). The County armed its officers with firearms, in part to allow them to accomplish this task. Thus, in light of the duties and responsibilities of KCSO officers who are recurringly called on to arrest

fleeing suspects, the need for more or different training of the deputies in Kiowa County regarding the limitations on the constitutional use of force against fleeing suspects was so obvious that repeatedly failing to do so was deliberately indifferent.

227.    The unconstitutional searches that took place during the stop of Mr. Morrell and Mr. Gifford were also part of a custom, habit, practice and the training of Kiowa County. As discussed above, even in the discipline Deputy Stump was given *the day before this shooting*, he was commended for "doing better with trying to find other violations on your stops… and trying to search vehicles." Using stops pretextually to find other violations, and "trying to search" vehicles without regard for probable cause for a search, was a practice openly encouraged by the Sheriff's Department and even commended the day before the overreaching, unconstitutional search of Zach Gifford turned deadly.

228.    County Defendants were also deliberately indifferent in failing to discipline or retrain Deputy Stump after repeated unconstitutional uses of deadly force despite being on notice of the need for such discipline and instead made clear to him, to Defendant Weisenhorn and others, that such behavior was tolerated, authorized, and condoned.

229.    Defendants' deliberately indifferent policies, customs, habits, practices, training, discipline, retention, and supervision were all a moving force and proximate cause of the violations of Plaintiff's constitutional rights.

230.    Kiowa County Defendants are also liable for the acts of its delegated final decision makers, including Undersheriff Weisenhorn's actions on April 9, 2020, as she was a final decision-maker.

231.    At all relevant times, Defendant Sheridan was a final policymaker for the County

Defendants such that his acts and omissions represent the County's official policy, and in that

capacity, he established and implemented policies, customs, training, and discipline for the

KCSO.

232.    Kiowa County Defendants also ratified the shooting of Mr. Gifford by knowing of

the conduct and approving its basis.

233.    As a result of the acts and omissions of complained of herein, Plaintiff Estate has

suffered injuries, damages and losses as set forth more fully in the statement of facts, including

the death of Zachary Gifford, entitling it to recover his compensatory and special damages,

including the value of loss of his constitutional rights, loss of life and pleasure of living, pain and

suffering before death, lost economic benefits and services that he provided to his community,

lost earnings and earnings capacity for the expected productive working lifetime of Zachary

Gifford under the mortality tables, loss of consortium, and other damages recoverable under 42

U.S.C. § 1983, all in amounts to be proven at trial.

234.    Plaintiff Estate has also incurred special damages in the form of funeral expenses.

235.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C.

§1988, pre-judgment interest and costs as allowable by federal law.

## VI.  PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the

Defendants and grant:

A.    Compensatory and consequential damages, including damages for the value of
Zachary Gifford's life, his loss of enjoyment and pleasure of life, his pre death
pain and suffering, his loss of relationships and consortium on all claims, and as
allowed by 42 U.S.C §1983 to effectuate its remedial purposes in amounts to be

determined at trial;

B.   Economic losses including lost future earnings and the value of Zachary Gifford's services on all claims allowed by law;

C.   Special damages in an amount to be determined at trial;

D.   Punitive damages on all federal claims allowed by law against individual Defendants in amounts to be determined at trial;

E.   Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988;

F.   Pre- and post-judgment interest at the lawful rate; and,

G.   Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 20th day of October, 2021.

*/s/ John R. Holland*
John R. Holland
*/s/ Anna Holland Edwards*
Anna Holland Edwards
Erica Grossman
Dan Weiss
Rachel Kennedy
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO  80218
303-860-1331
john@hheglaw.com